UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------
TOWN AND COUNTRY ADULT LIVING, INC.,
THE WESTCHESTER RESIDENCE AND CLUB,
LLC, ROBERT MISHKIN, and JOHN DOES NO. 1
THROUGH 129,

                                    Plaintiffs,

            - against -

VILLAGE/TOWN OF MOUNT KISCO,                          **OPINION & ORDER**
VILLAGE/TOWN OF MOUNT KISCO BOARD
OF TRUSTEES, J. MICHAEL CINDRICH,                        17-CV-8586 (CS)
ANTHONY MARKUS, JEAN FARBER, PETER
GRUNTHAL, KAREN B. SCHLEIMER,
VILLAGE/TOWN OF MOUNT KISCO
PLANNING BOARD, DOUGLAS HERTZ,
RALPH VIGLIOTTI, ENRICO MARESCHI, JOHN
BAINLARDI, MICHAEL BONFORTE, WILLIAM
POLESE, FRANK VITERITTI, JOHN
HOCHSTEIN, JOSEPH COSENTINO, and
WHITNEY SINGLETON,

                                    Defendants.
  ----------------------------------------------------------------

Appearances:

Brian H. Brick
Brick Law PLLC
White Plains, New York
*Counsel for Plaintiffs*

Terry Rice
Suffern, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' motion to dismiss Plaintiffs' Amended Complaint.  (Doc.

83.)

# I.    BACKGROUND

## A.    Facts

The Court accepts as true the facts, but not the conclusions, set forth in Plaintiffs'

Amended Complaint.  (Doc. 60 ("AC").)

### 1.    The Parties

Plaintiffs include the following entities and individuals:

- Town and Country Adult Living, Inc. ("Town and Country"), a corporation that operated an assisted living residence for senior citizens with disabilities at 53 Mountain Avenue in Mount Kisco, New York, (*id.* ¶¶ 43, 95);

- The Westchester Residence and Club, LLC ("WR&C"), a limited liability company that was formed to develop and operate – along with Town and Country – the 129-unit residence for senior citizens with disabilities that Plaintiffs have been trying to build at 270 Kisco Avenue in Mount Kisco, (*id.* ¶¶ 44, 97);

- Robert Mishkin, a citizen of New York who formed Town and Country and WR&C, (*id.* ¶¶ 45, 94, 97); and

- John Does No. 1 through 129, who are individuals whose identities are currently unknown but who were either the residents of the now-demolished senior assisted living residence previously located at 53 Mountain Avenue or the future residents of the senior assisted living residence that is the development project at issue in this action, (*id.* ¶ 46).

Defendants include the following entities and individuals:

- Village/Town of Mount Kisco ("Village" or "Mount Kisco"), (*id.* ¶ 47);

- Mount Kisco's Board of Trustees, (*id.* ¶ 48), and several individual members of the Board of Trustees, (*id.* ¶¶ 49-53);

- J. Michael Cindrich, former mayor of the Village and a trustee on the Board of Trustees, (*id.* ¶ 49);

- Anthony Markus, former deputy mayor of the Village and a trustee on the Board of Trustees, (*id.* ¶ 50);

- Jean Farber, deputy mayor of the Village and a trustee on the Board of Trustees; (*id.* ¶ 51);

- Mount Kisco's Planning Board (the "Planning Board"), which was responsible for the review and approval of all applications concerning site plans, subdivisions, change of use, and special permits, (*id.* ¶ 54);

- Douglas Hertz, the chairman of the Planning Board, (*id.* ¶ 55), and other individual members of the Planning Board, (*id.* ¶¶ 56-63); and

- Whitney Singleton, legal counsel to the Village with the title of "Village Attorney," (*id.* ¶ 64).

    2.   <u>2006 Settlement</u>

Sometime before 2006, Mount Kisco faced an increased need for residential housing for senior citizens with disabilities. (*See id.* ¶ 98.) To meet this need, Plaintiffs applied to the Village for a variance to expand on a prior non-conforming use to add the capacity to house an additional forty-six senior citizens at 53 Mountain Avenue. (*Id.*) Plaintiffs claim that the Village denied Plaintiffs' application for a variance because wealthy and politically connected residents whose properties neighbored 53 Mountain Avenue did not want additional senior citizens with disabilities living in their neighborhood. (*Id.* ¶ 99.)

Following the Village's denial of the variance, Plaintiffs filed an action in the Southern District of New York captioned *Town & Country Adult Living, Inc. v. The Village/Town of Mount Kisco*, 02-CV-444 (S.D.N.Y. 2002). (*Id.* ¶ 100.) The 2002 action alleged violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.* ("ADA"). (*Id.* ¶ 101.)

On December 19, 2005, the Village's Board of Trustees held a meeting to approve a property exchange that would settle the lawsuit. (*Id.* ¶¶ 103-104.) The exchange called for Plaintiffs to demolish their existing and operating senior adult assisted living facility at 53 Mountain Avenue and to deed 53 Mountain Avenue to the Village. (*Id.* ¶¶ 3, 111.) In return, the Village was obligated to sell 270 Kisco Avenue (which the Village owned) to Plaintiffs for

$3,500,000, once the Village provided Plaintiffs with site plan approval for a larger facility that Plaintiffs would build on the property. (*Id.* ¶¶ 3-4, 112-113.) Defendants estimated and represented to the court that site plan approval would take twelve months to complete. (*Id.* ¶ 4.) At the December 19 meeting, Singleton told the Trustees that the proposal to sell 270 Kisco Avenue to Plaintiffs would be "very beneficial" to the Village, noting that the Village would be getting rid of a non-conforming use and would receive double the value of what the Village was previously receiving under an old contract to sell 270 Kisco Avenue. (*Id.* ¶¶ 10, 106.)

On January 17, 2006, Plaintiffs and Defendants the Village, the Planning Board, and Singleton settled the lawsuit by agreeing to the property exchange. (*Id.* ¶¶ 2, 99; *see* Doc. 86 ("Rice Decl.") Ex. B ("Stipulation of Settlement").) The Stipulation of Settlement was signed by Singleton, Joseph Cosentino (as then-Chairman of the Planning Board), and Cindrich (as then-Village mayor). (AC ¶ 109.)

The Stipulation of Settlement contained the following terms, among others:

- The Village was required to close the sale of 270 Kisco Avenue within forty-five days after Planning Board approval of the site plan, (Stipulation of Settlement ¶ 2(d));

- Town and Country was to apply to the Village Board of Trustees for a zoning amendment to allow the project, (*id.* ¶ 4);

- "[T]he parties do hereby understand and agree that the Board of Trustees and the Planning Board are required to exercise independent judgment and discretion in reviewing the aforesaid applications," (*id.*);

- "Each party to this Stipulation shall exercise good faith and due diligence," (*id.* ¶ 11);

- Plaintiffs agreed to sign a release of the claims against the Village, which was to be held in escrow until the Planning Board granted site plan approval. (*Id.* ¶ 12.) In addition, Plaintiffs were required to obtain certain third-party approvals, including from the New York City Department of Environmental Protection, ("NYCDEP"), and Plaintiffs' failure to close based on the lack of third-party

approvals would not affect the Stipulation of Settlement or the releases issued to the Village.  (*Id.*)

3.      2007 Ground Lease

Eventually it became apparent that the site plan approvals would take longer than the Village originally estimated.  (AC ¶ 126.)  As a result, on January 22, 2007, the parties entered into a Ground Lease for 270 Kisco Avenue, under which the Village was the Landlord and both Town and Country and WR&C were co-tenants.  (*Id.*; *see* Rice Decl. Ex. C ("Ground Lease").)  The Ground Lease reiterated many of the terms of the Stipulation of Settlement, (AC ¶¶ 131-132), but also contained the following new terms, among others[1]:

- The Ground Lease, the Contract of Sale, and the Stipulation of Settlement would automatically terminate if Plaintiffs could not obtain site plan approval within thirty-nine months after entering into the Ground Lease; (*id.* ¶ 135; *see* Ground Lease ¶ 34.2);

- The Village had the option at any time six months after the execution of the Ground Lease to transfer title of the leased premises to the tenants, without site plan approval, (AC ¶ 136), and that other agencies may require other approvals would not constitute grounds to delay payment or transfer of title, (*id.* ¶ 137; *see* Ground Lease ¶ 34.9); and

- If the Ground Lease were terminated, the exchange of 53 Mountain Avenue for 270 Kisco Avenue would not take place, and all rights in 53 Mountain Avenue would remain with Plaintiffs, (AC ¶ 138; *see* Ground Lease ¶ 34.11).

Also in January 2007, Plaintiffs paid the Village $1,500,000 as a deposit on the purchase of 270 Kisco Avenue.  (*Id.* ¶ 27.)

---

[1] Because the version of the Ground Lease Defendants attached to the Rice Decl. appears to be partially redacted, the Court contacted Defendants' counsel and obtained an unredacted version. As discussed in Section II.B.2, I may consider these documents because they are referenced in and integral to the AC.  *See Vaccaro v. Bank of Am., N.A.*, No. 13-CV-2484, 2016 WL 4926201, at *1 n.1 (S.D.N.Y. Sept. 15, 2016) (collecting cases).

<u>Amending and Assigning the Ground Lease</u>

In December 2007, the parties entered into the first of ten different amendments to the Ground Lease over a seven-year period.  (*Id.* ¶ 141.)  In the Third Amendment, Plaintiffs agreed to contribute $500,000 to the Mount Kisco Open Space Fund or another fund the Village designated.  (*Id.* ¶ 144; *see* Rice Decl. Ex. F ¶ 3.)  As an alternative, Plaintiffs had the option to increase the $3,500,000 purchase price for 270 Mount Kisco by $500,000.  (*Id.*)  Plaintiffs allege that this is one of several examples of how the Village extracted – but Plaintiffs agreed to – additional money from Plaintiffs beyond the original $3,500,000 purchase price.  (AC ¶ 145.)  For example, the Village extracted or accrued payments of $15,000 for a "senior bus replacement" in the Fourth Amendment, (*id.* ¶ 146; *see* Rice Decl. Ex. G ¶ 7), $200,000 for the extension granted by the Seventh Amendment, (AC ¶ 146; *see* Rice Affirm Ex. L ¶ 3), $852,150 for the extension granted by the Ninth Amendment, (AC ¶ 146; *see* Rice Decl. Ex. N ¶ 4), and $150,000 for three monthly extensions under the Tenth Amendment, (AC ¶ 146; *see* Rice Decl. Ex. O ¶ 2.)  The Fourth Amendment also called for Plaintiffs to demolish the existing residence on 53 Mountain Avenue.  (AC ¶ 148; *see* Rice Decl. Ex. G ¶ 4.)

In 2012, Plaintiffs looked for a partner to assist with completing the approval process and the development of 270 Kisco Avenue.  (AC ¶ 150.)  Plaintiffs assigned the Ground Lease and deeded the property at 53 Mountain Avenue to the Fortus Group ("Fortus") and Hearth Senior Care (the "Hearth"), Town and Country's new development partners.  (AC ¶ 151.)  On August 27, 2012, Fortus, the Hearth, Town and Country, WR&C, and the Village signed the Fifth Amendment to the Ground Lease.  (AC ¶ 151.)  Plaintiffs allege that paragraph one of the Fifth Amendment recognized that Plaintiffs (or a nominee) had a right to repurchase the project and to succeed to the Ground Lease if the lease had not expired by the time of such repurchase, (*id.*

¶ 153), but the paragraph at issue (which I may consider, as discussed below) says nothing about a right; it merely says that if Town and Country were to buy 53 Mountain Avenue and the Ground Lease back from the Hearth, the Ground Lease would be extended another forty-five days, (Rice Affirm Ex. H ¶ 1).  Paragraph five of the Fifth Amendment confirmed that Plaintiffs had paid in full the $328,221.95 in real estate taxes, interest, and penalties that had been due for 270 Kisco Avenue.  (AC ¶ 154; Rice Decl. Ex. H ¶ 5.)  Paragraph seven of the Fifth Amendment provided that Plaintiffs "shall be responsible for payment of all outstanding real estate taxes for both the 53 Mountain Avenue and 270 Kisco Avenue properties to the date of closing (and it shall not be a default if those on the 53 Mountain Avenue are not paid until Closing.)"  (AC ¶ 155; Rice Decl. Ex. H ¶ 7.)

Between October 2012 and June 2013, the Hearth appeared before the Planning Board and re-designed the planned project for 270 Kisco Avenue to satisfy the Village's existing concerns about the site plan.  (Id. ¶ 166.)  At a Planning Board meeting held on May 29, 2013, Planning Board Chairman Cosentino said that the Hearth and Plaintiffs had done "a fantastic job" with the site plan application and in working with the Village's officials for the project. (AC ¶ 167.)

From May 2013 through March 2014, the parties extended the lease period several times. (Id. ¶ 156.)  The Tenth Amendment to the Ground Lease, dated January 8, 2015, extended the lease term to May 30, 2015, and provided the right to extend the lease term for three additional months (to August 31, 2015) with each month of extension costing an additional $50,000 payable to the Village.  (AC ¶ 157; Rice Decl. Ex. O ¶ 2.)  Paragraph eight of the Tenth Amendment provided that the Village "acknowledge[d] and agree[d] that it has not objected to and will raise no objections to the development, construction, ownership and operation of a

senior enriched/independent living housing facility at [270 Kisco Avenue], so long as it remains substantially in the same form that is proposed before the Planning Board at the time of the execution of this Tenth Amendment." (AC ¶ 158; Rice Decl. Ex. O ¶ 10.) In addition, although Plaintiffs would need approval from NYCDEP for their planned development of 270 Kisco Avenue, the Ninth Recital of the Tenth Amendment clarified that the Village is not obligated "to delay the closing of the sale of 270 Kisco Avenue for any third-party approvals, specifically including NYCDEP approval." (AC ¶ 159 (alterations in original).) Although this language seems to provide the Village with the option to proceed with the closing even if third-party approvals were not in place, or to delay it pending such approvals, Plaintiffs allege that this provision – in addition to Paragraph twelve of the Stipulation of Settlement and Paragraph 34.9 of the original Ground Lease – meant that the Village could not use the pendency or lack of NYCDEP approval as a reason to delay the closing of the Village's sale of 270 Kisco Avenue to Plaintiffs. (*Id.* ¶¶ 160-161.)

Plaintiffs allege that the Village began attempting to extract general releases from Plaintiffs and the Hearth before the Village would be willing to extend the term of the Ground Lease. (*Id.* ¶ 162.) In a series of emails sent in December 2014, Singleton wrote that the Village would agree to a five-month extension "provided the two releases are signed." (*Id.* ¶ 162.) Plaintiffs refused to sign the general release, but the Hearth provided the requested release and obtained an extension of the Ground Lease. (*Id.* ¶ 164.) The Ground Lease was extended to August 31, 2015. (*Id.* ¶ 165.)

Plaintiffs allege that the Village continued to delay issuing site plan approval while the project awaited NYCDEP's approval. (*Id.* ¶ 169.) In August 2015, with the expiration of the Ground Lease approaching, an attorney for Plaintiffs contacted Singleton and advised him that

before the Ground Lease expired on August 31, 2015, Plaintiffs wished to exercise the repurchase rights for which the Fifth Amendment provided, allowing them to recover what they had assigned to the Hearth. (*Id.* ¶ 170.) Singleton determined that Plaintiffs were not entitled to any notice of any lease extensions or of the purported termination of the Ground Lease, and the Village did not send Plaintiffs the required notices under the Ground Lease. (*Id.* ¶¶ 171-172.) Several weeks later, without having given Plaintiffs notice and the opportunity to reacquire the Ground Lease, Singleton declared that the Ground Lease had expired on September 1, 2015. (*Id.* ¶ 173.)

Plaintiffs allege in conclusory fashion that they exercised their repurchase "rights" but provide no facts except that they notified Fortus, the Hearth, and the Village of their intention to do so. (*Id.* ¶¶ 77-78, 80, 170.) They do not allege what they did to buy back 53 Mountain Avenue or the Ground Lease and elsewhere seem to concede that they did not do so before the Ground Lease expired under the terms of the Tenth Amendment. (*Id.* ¶ 180 (in June 2016, the Hearth advised Plaintiffs that Plaintiffs could repurchase 53 Mountain Avenue and rights under Ground Lease); *id.* ¶ 173 (Singleton declared "Ground Lease had expired on September 1, 2015 – without having given Plaintiffs notice and the opportunity to reacquire the Ground Lease").)

After that, the Village offered an Eleventh Amendment only to The Hearth, which the Hearth refused to sign. (*Id.* ¶ 174.) The Hearth continued to pay the taxes on 270 Kisco Avenue, and the Village continued to allow taxes to accrue on 53 Mountain Avenue, even though the business was closed and the existing 21,000 square-foot residence on the property had been demolished. (*Id.* ¶ 175.)

In the last several months of 2015 through mid-2016, the Village negotiated only with the Hearth and refused to allow Plaintiffs to close on the purchase of 270 Kisco Avenue. (*Id.* ¶¶ 176,

178.)  In or about June 2016, Singleton offered the Hearth a new proposal that Plaintiffs allege essentially mimicked the terms of the exchange originally contemplated by the Stipulation of Settlement.  (*Id.* ¶ 179.)  Later that same month, the Hearth elected to terminate the agreements it had entered into with Plaintiffs and advised Plaintiffs that the termination allowed Town and Country the right to repurchase its interests and rights under the Ground Lease and the 53 Mountain Avenue property.  (*Id.* ¶ 180.)  Throughout July, August, and September 2016, Plaintiffs allege that the Village repeatedly ignored Plaintiffs' requests to meet and to close on the purchase of 270 Kisco Avenue.  (*Id.* ¶ 181.)  In July 2016, Singleton advised Plaintiffs that they would have to engage a qualified developer to assist with the project before they would be allowed to buy 270 Kisco Avenue.  (*Id.* ¶ 183.)  He also advised that Plaintiffs would have to sign general releases before the Village would agree to the sale.  (*Id.* ¶ 184.)  In or about October 2016, Plaintiffs introduced HFZ Capital Group ("HFZ"), an experienced developer, to the Village.  (*Id.* ¶ 185.)  Singleton continued to demand that Plaintiffs sign general releases before the Village would agree to any lease extensions.  (*Id.* ¶ 186.)

On November 22, 2016, the Village and Singleton advised Plaintiffs that the Village had filed a tax foreclosure on 53 Mountain Avenue.  (*Id.* ¶ 188.)  Through the foreclosure, the Village gained ownership of 53 Mountain Avenue for the unpaid taxes, despite its agreement in the Fifth Amendment that it would not constitute a tax deficiency if the accrued taxes on 53 Mountain Avenue were paid at the closing of the sale of 270 Kisco Avenue.  (*Id.* ¶¶ 34, 155.)  Plaintiffs allege that Singleton precipitated the Village's foreclosure of 53 Mountain Avenue and that the Village kept the surplus well above the amount of taxes that were due.  (*Id.* ¶ 35.)  Specifically, approximately $1,200,000 were due in taxes for 53 Mountain Avenue at the time of the 2016 foreclosure, but Plaintiffs allege that the value of the property was at least $4,500,000.

(*Id.* ¶ 36.)  This required the Village to pay the difference after satisfying the taxes due, but Plaintiffs allege that the Village kept the property, refused to allow Plaintiffs to pay the taxes owed, and converted several million dollars that belonged to Plaintiffs.  (*Id.*)

On November 28, 2016, the Hearth's attorney sent a letter to the Village (including Singleton, the Village Manager, and Cindrich) stating that the Village should continue to negotiate with Plaintiffs to close the sale of 270 Kisco Avenue.  (*Id.* ¶ 182.)  On December 8, 2016, Cindrich sent Mishkin an email in which he wrote that he remained committed to Plaintiffs' development of the property in accordance with the most recent amendments to the Ground Lease that had been presented to Plaintiffs' former development partners.  (*Id.* ¶ 30.)  But Singleton's insistence on receiving general releases from Plaintiffs before any meeting would take place between HFZ and the Planning Board continued into December 2016.  (*Id.* ¶ 192.)

In February 2017, Mishkin and a representative of HFZ met with Cindrich, Trustee Jean Farber and Trustee Anthony Markus to conclude the terms of an option agreement for the purchase of 270 Kisco Avenue.  (*Id.* ¶ 193.)  Plaintiffs, HFZ, and the Village agreed to final terms for the purchase without any general releases or the other conditions Singleton had previously requested.  (*Id.*)

On March 13, 2017, the Board of Trustees voted unanimously to authorize Cindrich to execute any documents necessary for the transfer of 270 Kisco Avenue to Plaintiffs.  (*Id.* ¶ 194.)  The Board also authorized Cindrich and Singleton to finalize the terms of the written option agreement.  (*Id.*)  By mid-April 2017, the option contract was ready for the Village's signature with no further issues to discuss, but Singleton advised HFZ that the Village was not going to

sign the option agreement until after the May 1, 2017 Village Board of Trustees meeting. (*Id.* ¶ 195.)

At the board meeting held on April 17, 2017, several people advocated to preserve 270 Kisco Avenue from any development despite the fact that for years, there had essentially been no opposition to Plaintiffs' proposed plan. (*Id.* ¶¶ 196-197.) Plaintiffs allege that Singleton was behind the public protest of the development of 270 Kisco to thwart the Trustees' approval of the option agreement, (*id.* ¶¶ 25, 222; *see id.* ¶ 197; *see also* Doc. 89 ("Ps' Opp.") at 31-32), but provide no facts supporting that conclusion.

At some point following the Board of Trustees' approval to enter into the option agreement, Singleton suggested that Cindrich get an independent ethical opinion as to whether he was conflicted in approving and signing the option agreement because his residence was located near 270 Kisco Avenue. (*Id.* ¶ 200.) It is unclear whether Cindrich ever obtained such an ethical opinion, (*id.* ¶ 203), but the Village has never indicated the results of that opinion or any determination about whether Cindrich had a conflict, (*id.*).

At some point not made clear in the AC, Singleton issued a formal opinion to the Village and its agents advising that the Village had no obligation to sell 270 Kisco Avenue to Plaintiffs and that Plaintiffs had forfeited their rights to sue Defendants. (*Id.* ¶ 204.) Singleton began steering the Village toward 2 Morgan Drive, a property on which his close friend and client wanted to build a new senior housing project similar to what Plaintiffs want to build at 270 Kisco Avenue. (*Id.* ¶¶ 17, 211, 214.) The property at 2 Morgan Drive was the former site of a New York City sewage waste treatment plant and would require years of remediation before a home for senior citizens with disabilities could be built safely. (*Id.* ¶ 212.)

Plaintiffs allege that based upon Singleton's advice, Trustees Karen Schleimer and Peter Grunthal turned against Plaintiffs' project, despite having previously supported it. (*Id.* ¶¶ 209, 218.) At the April 17, 2017 Village Board meeting, Schleimer said that the deal with Plaintiffs "is over" and that "we believe on advice of [Village] counsel [Singleton] that the threat of litigation and the downside from that old deal is past." (*Id.* ¶ 219 (alterations in original).) Grunthal eventually came to believe that 2 Morgan Drive was the perfect location to build senior housing. (*Id.* ¶ 220.) At the April 17 board meeting, Cosentino said that the Board of Trustees should not approve the sale and development of 270 Kisco Avenue. (*Id.* ¶ 221.)

     5.    <u>Plaintiffs' Claims</u>

Plaintiffs allege that they have complied with their part of the Stipulation of Settlement. (*Id.* ¶ 27.) They paid the Village $1,500,000 as the down payment for the purchase of 270 Kisco Avenue, which the Village has been holding since January 2007. (*Id.*) Plaintiffs also phased out the operation of their existing business at 53 Mountain Avenue, and the building on the property was demolished at the encouragement of the Village. (*Id.*)

Plaintiffs also claim Defendants have extracted from Plaintiffs additional payments and promises beyond the existing consideration for the sale of 270 Kisco Avenue. (*Id.* ¶ 31.) Among other things, Defendants increased the purchase price balance that would be due to close the sale to $4,100,000 (in addition to the $1,500,000 deposit that Plaintiffs paid back in 2007). (*Id.*) Plaintiffs allege that the long-running delays for their site plan approval have caused them to incur more costs with a corresponding loss of revenue both from the existing business at 53 Mountain Avenue and the intended business at 270 Kisco Avenue. (*Id.* ¶ 39.) Plaintiffs further allege that the Village's repossessing of 53 Mountain Avenue through a tax foreclosure resulted in (1) the Village owning both 270 Kisco Avenue and 53 Mountain Avenue, (2) the Village

keeping the surplus beyond the amount of taxes due, (3) the Village keeping Plaintiffs' $1,500,000 contract deposit, and (4) the Village giving up nothing in return. (*Id.* ¶ 37.)

Plaintiffs seek an order of specific performance directing the Village to close the sale of 270 Kisco Avenue to Plaintiffs in exchange for the payment of the $2,000,000 balance of the purchase price that the Stipulation of Settlement contemplated. (*Id.* ¶ 231.) As an alternative to specific performance, Plaintiffs demand that Defendants (1) restore their ownership of 53 Mountain Avenue, (2) compensate Plaintiffs for the 21,000 square-foot residence, the demolition of that residence, and lost profits from the revenue from the demolished residence, and (3) return Plaintiffs' $1,500,000 contract deposit that the Village has been holding since 2007, plus any applicable interest. (*Id.* ¶ 232.)

## B.     Procedural History

Plaintiffs filed their original complaint on November 7, 2017. (Doc. 21.) On January 16, 2018, Defendants requested a pre-motion conference in anticipation of their motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Doc. 49.) Plaintiffs responded by letter on February 9, 2018, (Doc. 51), and on February 16, 2018, the Court held a pre-motion conference to discuss the motion, (Minute Entry dated Feb. 16, 2018). With leave of the Court, (*see* Doc. 52), Plaintiffs filed the AC on May 1, 2018, (Doc. 60). The parties attempted to file their motion papers on August 10, 2018, but failed to do so because of filing errors. (Docs. 71-75, 77-82.) Defendants re-filed their motion to dismiss on August 24, 2018, (Docs. 83-88), and Plaintiffs filed their opposition papers on August 27, (Docs. 89-91). Defendants' reply papers were never properly filed but I understand Docs. 77 and 78, filed and rejected on August 10, 2018, to be their reply submission.

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679.  Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

### 2.     Motion to Dismiss for Lack of Subject Matter Jurisdiction

To survive a motion to dismiss under Rule 12(b)(1), a district court must have "the statutory or constitutional power to adjudicate" the matter at issue. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "[D]efects in subject matter jurisdiction may be raised at any time during the proceedings." *Fuller v. Bd. of Immigration Appeals*, 702 F.3d 83, 88 (2d Cir. 2012) (internal quotation marks and alteration omitted). "[B]ecause standing is necessary to [the Court's] jurisdiction, [the Court is] obliged to decide the question at the outset." *Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2d Cir. 2016). Ripeness is also a matter of subject matter jurisdiction. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013).

### B.     **Documents Properly Considered**

#### 1.     Legal Standard

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . , and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Village of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted). "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (internal quotation marks omitted). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect. Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited

quotation[s] from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir.

2016) (alteration in original) (citation and internal quotation marks omitted). When a court takes

judicial notice of a document on a motion to dismiss, it should generally do so only "to

determine what statements [the documents] contain [ ] . . . not for the truth of the matters

asserted." *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (alterations in

original) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

 In contrast, on a motion to dismiss pursuant to Rule 12(b)(1), "the Court may look to

affidavits and other evidence outside the pleadings to resolve disputed jurisdictional fact issues."

*E. Paralyzed Veterans Ass'n v. Lazarus-Burman Assocs.*, 133 F. Supp. 2d 203, 208 (E.D.N.Y.

2001); *cf. Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[I]t is within the trial court's power to

allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits,

further particularized allegations of fact deemed supportive of plaintiff's standing."); *McDermott

v. N.Y. Metro LLC*, 664 F. Supp. 2d 294, 298 (S.D.N.Y. 2009) ("'[O]nce the defendants' motion

to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) puts the plaintiffs' Article III

standing in issue, the district court has leeway as to the procedure it wishes to follow.'")

(alterations omitted) (quoting *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d

82, 87-88 (2d Cir. 2006)). A district court may not, however, "'rely on conclusory or hearsay

statements contained in'" the documents outside the pleadings. *TZ Manor, LLC v. Daines*, 815

F. Supp. 2d 726, 734 (S.D.N.Y. 2011) (quoting *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d

107, 110 (2d Cir. 2004)).

  2. <u>Documents Submitted by the Parties</u>

 Plaintiffs attached to the declaration of their attorney, (Doc. 91), the following exhibits:

(1) Singleton's affirmation filed in the Supreme Court of Westchester County, (*id.* Ex. 1); (2) an

email chain dated April 24, 2017 that appears to discuss a Village Board of Trustees meeting scheduled for April 25, 2017, (*id.* Ex. 2); (3) letters from Defendants' counsel to Magistrate Judge George A. Yanthis dated June 30, 2006, and February 14, 2007, (*id.* Exs. 3-4); (4) an order from Magistrate Judge Yanthis dated September 20, 2007, (*id.* Ex. 5); (5) the foreclosure deed to 53 Mountain Avenue, (*id.* Ex. 6); (6) the option agreement between the Village of Mount Kisco and HFZ, (*id.* Ex. 7); (7) several court documents filed in the Supreme Court of Westchester County, (*id.* Exs. 8-10); (8) a timeline of relevant events in this case ranging from January 2001 through August 2017, (*id.* Ex. 11); (9) the transcript of Mishkin's 50-h testimony dated August 17, 2017, (*id.* Ex. 12); (10) a memorandum written by Mishkin's attorney – which also contains several attachments – that supplements Mishkin's testimony in the 50-h hearing; and (11) Mount Kisco Village Code Section 110-45, (*id.* Ex. 14).

Defendants submitted three sworn statements and numerous exhibits as well. Douglas Hertz's affidavit, (Doc. 84), is accompanied by a timeline of events ranging from January 7, 2006, through April 25, 2017, (*id.* Ex. 1), and a copy of the minutes from a Village Planning Board meeting held on March 25, 2006, (*id.* Ex. 2). Carl Guy's affidavit has no attachments and offers factual allegations regarding the contractual relationships in this case. (Doc. 85.) Defense counsel Terry Rice's declaration, (Rice Decl.), is accompanied by, among other things, the underlying contractual agreements between the parties, (*id.* Exs. B-O), and a decision from Justice Mary H. Smith in the Supreme Court of Westchester County dated October 24, 2016, (*id.* Ex. P).

I will consider the underlying contractual agreements between the parties because they are referenced in and integral to the AC. *See Vaccaro*, 2016 WL 4926201, at *1 n.1 (collecting cases). I will also take judicial notice of any documents that are in the public record, such as

court documents filed in other cases, judicial opinions, Planning Board meeting minutes, and Mount Kisco's zoning code. *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (internal quotation marks omitted); *Byrd v. City of N.Y.*, No. 04-CV-1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) (summary order) ("[M]aterial that is a matter of public record may be considered in a motion to dismiss."); *Town of New Windsor v. Avery Dennison Corp.*, No. 10-CV-8611, 2012 WL 677971, at *6 (S.D.N.Y. Mar. 1, 2012) (considering board meeting minutes on a motion to dismiss); *Missere v. Gross*, 826 F. Supp. 2d 542, 553 (S.D.N.Y. 2011) (court permitted to "take judicial notice of all documents in the public record, including . . . the provisions of the Village zoning code"). I will consider the sworn statements for purposes of the 12(b)(1) motion, *see McCray v. Lee*, No. 16-CV-1730, 2018 WL 1620976, at *5 (S.D.N.Y. Mar. 29, 2018), but not the 12(b)(6) motion, *see Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).

I will not consider the parties' timelines because the parties undoubtedly dispute the completeness and authenticity of the other side's version of events. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("[I]t must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.") (internal quotation marks omitted). I will consider the email chain dated April 24, 2017, the transcript of Mishkin's 50-h testimony dated August 17, 2017, and the memorandum written by Mishkin's attorney only for purposes of Defendants' 12(b)(1) motion because they are improper on a motion to dismiss; there is no indication that Plaintiffs relied on these documents in drafting their AC, they are not attached to the AC or incorporated by reference in it, and they are not documents of which

judicial notice may be taken. *See Syracuse v. Loomis Armored US, LLC*, No. 11-CV-744, 2012 WL 88332, at *3 n.3 (N.D.N.Y. Jan. 11, 2012). But these documents do not affect my disposition here in any event.

## III. MOTION TO DISMISS

### A. Standing

Article III of the Constitution limits a federal court's jurisdiction to actual "cases" and "controversies." U.S. Const. art. III, § 2; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). "Constitutional standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (internal quotation marks omitted). There are three constitutional standing requirements that every plaintiff must satisfy in order to invoke the jurisdiction of the federal courts: (1) "an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest)"; (2) "causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant)"; and "(3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (internal quotation marks and alterations omitted). These minimum requirements to invoke jurisdiction exist in all cases, separate and apart from whatever statutory standing requirements may exist in the laws under which a plaintiff has filed suit. *See generally All. for Envtl. Renewal*, 436 F.3d at 85-86. The party invoking federal jurisdiction bears the burden of establishing that it has standing to do so. *Lujan*, 504 U.S. at 561.

Defendants argue that Plaintiffs lack standing to bring their claims because on August 27, 2012, Plaintiffs assigned all of their rights and interests in the Ground Lease to the Hearth. (Doc.

87 ("Ds' Mem.") at 10-12.) I find Plaintiffs have standing to bring their claims for many of the

reasons cited in Judge Kenneth M. Karas's opinion in *Cunney v. Bd. of Trs.*, 56 F. Supp. 3d 470,

492 (S.D.N.Y. 2014). In *Cunney*, Judge Karas found that the plaintiff – who sought

compensatory damages under § 1983 for a financial loss, who suffered as a direct result of

defendants' allegedly unconstitutional enforcement of a zoning law, and whose injuries could be

redressed by a court order awarding plaintiff monetary relief – had standing to bring his claims.

*Id.* at 490-92. Although *Cunney* was decided on a motion for summary judgment, I find

Plaintiffs here have pleaded similar facts to satisfy standing, including allegations of a financial

loss, (AC ¶¶ 39, 40, 72, 247, 278, 369), caused by Defendants' allegedly unconstitutional

actions, (*id.* ¶¶ 93, 376-382, 389-393), in pursuit of monetary damages, (*id.* ¶¶ 75, 233-235, 337,

347, 382, 393).

Judge Karas explained that "a party has standing to challenge an unconstitutionally

applied zoning law even if the party is not the owner of the subject property," *Cunney*, 56 F.

Supp. 3d at 491-92 (collecting cases), and cited the Supreme Court's decision in *Warth*, 422 U.S.

at 504-05, in rejecting the defendants' argument that plaintiff had no standing because he did not

own the property when the constitutional violation occurred, *Cunney*, 56 F.3d at 492. In *Warth*,

the Supreme Court held that

> [t]he fact that the harm to [the plaintiffs] may have resulted indirectly does not in
> itself preclude standing. When a governmental prohibition or restriction imposed
> on one party causes specific harm to a third party, harm that a constitutional
> provision or statute was intended to prevent, the indirectness of the injury does not
> necessarily deprive the person harmed of standing to vindicate his rights.

*Warth*, 422 U.S. at 504-05. Here, Plaintiffs have alleged that they applied for the site plan

application and variance, were denied, and allegedly suffered economic loss. (Ps' Opp. at 5-6.)

That Plaintiffs assigned rights from the Ground Lease to the Hearth does not preclude standing

because their grounds for standing do not necessarily depend on their having had a property interest in 270 Kisco Avenue for the entire period at issue. Instead, Plaintiffs can rely on their alleged financial harm that was allegedly caused by governmental action. Therefore, Plaintiffs have standing to bring their constitutional claims.[2] Whether such claims would be timely or meritorious is of course a separate issue.

Because Plaintiffs have satisfied Article III standing requirements, they also have standing to bring their FHA and ADA claims. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) ("[T]he sole requirement for standing to sue under [the FHA] is the [Article] III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable injury.") (internal quotation marks omitted); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995) (to establish FHA standing, plaintiff must allege injury-in-fact within meaning of Article III); *Transp. Workers Union of Am., Local 100 v. N.Y.C. Transit Auth.*, 342 F. Supp. 2d 160, 166 (S.D.N.Y. 2004) ("[N]either Title I nor Title II of the ADA imposes a statutory standing requirement.").

### B.     Ripeness

Defendants argue that Plaintiffs' federal claims are not ripe for adjudication. (Ds' Mem. at 13-14.) Ripeness is a jurisdictional inquiry, *see, e.g.*, *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 110 (2d Cir. 2009), and accordingly the Court "must presume that [it] cannot entertain [Plaintiffs'] claims unless the contrary appears affirmatively from the record," *Murphy v. New*

---

[2] Defendants argue that Plaintiffs are bound by an October 14, 2016 judgment in a case they brought against the Hearth under Article 15 of the New York Real Property Actions and Proceedings Law. (Ps' Opp. at 11.) The court found that Plaintiffs had assigned their entire interest in the Ground Lease to the Hearth and had not repurchased it. (Rice Decl. Ex. P at 6-7.) That fact, and Defendants' argument that Plaintiffs are not third-party beneficiaries of the now-expired Ground Lease, (*id.* at 11-12), do not undermine my ruling.

*Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (internal quotation marks omitted).

The concept of ripeness is "rooted in Article III's case or controversy requirement and the

prudential limitations on the exercise of judicial authority." *S&R Dev. Estates, LLC v. Bass*, 588

F. Supp. 2d 452, 460 (S.D.N.Y. 2008). The ripeness doctrine "ensure[s] that a dispute has

generated injury significant enough to satisfy the case or controversy requirement of Article III

of the U.S. Constitution." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d

83, 90 (2d Cir. 2002). It also prevents courts from "entangling [themselves] in abstract

disagreements over matters that are premature for review because the injury is merely

speculative and may never occur, depending on the final administrative resolution." *Id*. The

ripeness requirement defers federal review of claims until they have "arisen in a more concrete

and final form." *Murphy*, 402 F.3d at 347.

Before any land use dispute – whether brought as a takings, due process, or equal

protection claim – is ripe for review, a plaintiff must satisfy the finality requirement of ripeness.

*Lost Trail LLC v. Town of Weston*, 289 F. App'x 443, 444 (2d Cir. 2008) (summary order);

*Murphy*, 402 F.3d at 347-48; *Caldarola v. Town of Smithtown*, No. 09-CV-272, 2010 WL

6442698, at *7 (E.D.N.Y. July 14, 2010). The relevant test is whether "the government entity

charged with implementing the regulations has reached a final decision regarding the application

of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v.

Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985).[3] Although initially developed in the

---

[3] On January 16, 2019, the Supreme Court heard a second round of oral arguments in *Knick v. Township of Scott*, No. 17-647 (Nov. 2, 2017). The Court granted the petition for a writ of certiorari limited to one question: "Whether the Court should reconsider the portion of *Williamson* . . . requiring property owners to exhaust state court remedies to ripen federal takings claims." Petition for Writ of Certiorari at i, *Knick v. Township of Scott*, No. 17-647 (Oct. 31, 2017) (citation omitted). With no indication about which way the Court will decide the issue or, if the Court overturns the *Williamson* finality rule, whether the Court's decision will be limited to

context of takings, the *Williamson* finality requirement has been extended to equal protection, substantive and procedural due process, and discrimination claims in the land use context. *See Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 123 (2d Cir. 2014) (applying finality requirement to discrimination claims unless plaintiff can show he suffered some injury independent of the challenged land use decision); *Kowalczyk v. Barbarite*, 594 F. App'x 690, 692 (2d Cir. 2014) (summary order) (applying finality requirement to procedural due process); *Dougherty*, 282 F.3d at 88-89 (equal protection and substantive due process); *Southview Assocs. Ltd. v. Bongartz*, 980 F.2d 84, 96-97 (2d Cir. 1992) (substantive due process).

Plaintiffs do not contend that they obtained a final decision. Instead, they contend that their failure to obtain a final decision from Defendants should be excused under the futility exception. (Ps' Opp. at 9-13.) A property owner will be excused from obtaining a final decision "'if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile. That is, a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied.'" *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014) (quoting *Murphy*, 402 F.3d at 349). To demonstrate futility, a plaintiff must demonstrate: "(1) that the plaintiff filed at least one meaningful application; and 2) that the denial of another application is inevitable because the government entity used – and will in all likelihood continue to use – repetitive and unfair procedures, thereby avoiding a final decision." *Cmty. Servs. for Developmentally Disabled of Buffalo v. Town of Boston*, No. 16-CV-359, 2018 WL 1795644, at *3 (W.D.N.Y. Apr. 16, 2018) (internal quotation marks omitted). It is well established that the standard for finding futility is

federal takings claims only, the *Williamson* finality rule remains the law of this Circuit, and I apply it here.

24

high.  *See Sherman*, 752 F.3d at 563.  "But when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical, the high standard is met."  *Id.*

Even assuming Plaintiffs have filed a "meaningful application" with the Planning Board and the Board of Trustees, Plaintiffs have failed to show that Defendants have "dug in [their] heels and made clear that all . . . applications will be denied," *Murphy*, 402 F.3d at 349.  There is no indication that denial of Plaintiffs' application would be inevitable, especially considering that Defendants willingly entered into a lease and ten extensions to effectuate the terms of the Stipulation of Settlement.  (AC ¶¶ 126-138, 141-165.)  Plaintiffs themselves allege that the Planning Board held "in excess of *50 hearings and meetings*" and "countless additional meetings" before the Board of Trustees as part of the process to grant Plaintiffs site plan approval.  (*Id.* ¶ 13 (emphasis in original).)  The parties' extensive history of cooperation is sufficient to support the possibility of Plaintiffs being permitted to move forward with the site plan application.  For example, on March 13, 2017, the Board of Trustees voted unanimously to authorize Cindrich to execute any documents necessary for the transfer of 270 Kisco Avenue to Plaintiffs.  (*Id.* ¶ 194.)  The Board also authorized Cindrich and Singleton to finalize the terms of the written option agreement.  (*Id.*)  Although the option agreement was never finalized (at least in part because of Plaintiffs' unwillingness to waive its right to sue), and although Plaintiffs have waited twelve years for their site plan application and variance to be granted, they have apparently not yet obtained the necessary third-party (*e.g.*, NYSDEP) approvals for the project, and at this point have only raised a doubt about whether their land use application would be granted.  But "mere doubt . . . that [an] application will be denied" is insufficient to invoke the futility exception.  *Rivendell Winery, LLC v. Town of New Paltz*, 725 F. Supp. 2d 311, 319 (N.D.N.Y. 2010).

Plaintiffs' allegations of hostility and bad faith by the Village, (*see* AC ¶¶ 34, 37, 73, 117, 188, 230), similarly fail to excuse their failure to obtain a final decision, *see Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 408 (E.D.N.Y. 2008) (collecting cases). Evidence of hostility by local officials is also not alone enough to satisfy the futility exception, *see, e.g.*, *S&R Dev. Estates*, 588 F. Supp. 2d at 463 ("Futility does not exist merely because of hostility to the developer's plans."), especially where a plaintiff fails to connect that evidence to "the body charged with deciding [variance] application[s]," *Kowalczyk*, 594 F. App'x at 693; *see S&R Dev. Estates*, 588 F. Supp. 2d at 463 ("Although [plaintiff] has faced opposition to its development plan from town officials and influential town groups, it has not shown that the prospect of refusal from the ZBA would be certain."); *Goldfine v. Kelly*, 80 F. Supp. 2d 153, 160-61 (S.D.N.Y. 2000) (allegations of open hostility by or conspiracy among defendants insufficient to show that refusal was certain). While Plaintiffs have alleged that Singleton acted in bad faith, no similar allegations exist with respect to the bodies or individuals with ultimate decision-making authority. Because there is no indication that Defendants have used "repetitive and unfair procedures" or "engaged in a war of attrition" against Plaintiffs to avoid issuing a final decision, *545 Halsey Lane Props., LLC v. Town of Southampton*, No. 14-CV-800, 2015 WL 3824050, at *4 (E.D.N.Y. June 19, 2015) (internal quotation marks omitted) – indeed, the various amendments extended the lease term despite listing myriad obligations that Plaintiffs had failed to timely accomplish, *see, e.g.*, Rice Decl. Ex. G at 1; *id.* Ex. H ¶¶ 9-10; *id.* Ex. O at 2) – the Court declines to invoke the futility exception required for Plaintiffs' claims to be deemed ripe for adjudication.

While the saga Plaintiffs describe has gone on for a bizarrely long time, Plaintiffs do not allege that the various amendments lacked consideration, nor do they even really allege (except

perhaps in the most general terms) that whatever reasons the Village gave for withholding site plan approval were false or illegitimate. By Plaintiffs' own account, there were several years with no activity before the Planning Board. In other words, the delay is in these circumstances not plausibly an indication of futility, and while three members of the Village Board expressed opposition to the deal on the table at the April 17, 2017 meeting, (AC ¶¶ 218-221), that hardly suggests that all further proposals would be rejected. Accordingly, the federal claims are not yet ripe. In an excess of caution, however, I consider them further.

## C. Individual Defendants

Even if ripe, all federal claims against the individual Defendants except for Singleton would have to be dismissed because the AC is devoid of any factual allegations that plausibly describe any particular wrongful conduct on their parts.

First, Plaintiffs' § 1983 claims against individual Defendants must be dismissed because there are no facts in the AC that allege that the individual Defendants were personally involved in any alleged constitutional deprivation. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotation marks omitted). Personal involvement can be demonstrated in a few ways, *see Jamison v. Chapman*, No. 08-CV-856, 2009 WL 3762348, at *10 (N.D.N.Y. Nov. 9, 2009), and "involvement as a voting member of [a] board may be sufficient personal involvement," *Ruston v. Town Bd.*, No. 06-CV-927, 2009 WL 3199194, at *4 (N.D.N.Y. Sept. 30, 2009). But "[d]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal," *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) (internal quotation marks omitted).

Thus, when an allegedly discriminatory action is taken by an entity, for a participant in the decision-making process to be held liable for that action, the plaintiff must demonstrate that the individual defendant acted with an improper motive and played a "meaningful role" in the decision making process, *see Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008), or was a "moving force[]" behind the discriminatory treatment, *see Jeffries v. Harleston*, 21 F.3d 1238, 1247 (2d Cir.), *vacated and remanded on other grounds*, 513 U.S. 996 (1994); *see also Bender v. City of N.Y.*, No. 09-CV-3286, 2011 WL 4344203, at *3 (S.D.N.Y. Sept. 14, 2011) ("Further, to succeed on a Section 1983 claim, a plaintiff must establish causation by showing that defendants participated in, or were moving forces behind, the deprivation.") (internal quotation marks omitted).

Plaintiffs have not alleged that the individual Defendants other than Singleton played either a meaningful role or were a moving force behind any discriminatory treatment. Plaintiffs argue that in 2017, three Village Board members reversed their support for Plaintiffs' project, (Ps' Opp. at 36), but such allegations hardly amount to playing a "meaningful role" or acting as a "moving force." At no point in the AC do Plaintiffs describe any Village Board vote that did not go their way. Further, they do not allege facts plausibly suggesting improper motive; the allegations to which they point in this regard, (*see* Ps' Opp. at 37), are entirely conclusory, (*see* AC ¶¶ 351-353, 377-378, 388-389). Indeed, Plaintiffs' allegations suggest that the Village Board members who changed their minds did so based on Singleton's advice and because they had had it after ten extensions. (*Id.* ¶¶ 218-219, 221.) The AC is devoid of allegations from which it could be discerned which Village Board or Planning Board members acted with illegal intent, if any, or whether or how their votes influenced any adverse action against Plaintiffs.

Thus, their personal involvement in the deprivation of Plaintiffs' constitutional rights is insufficiently pleaded.

Second, Title II of the ADA does not permit suits against officials in their individual capacities, *see Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001), and Plaintiffs in any event abandoned any such claims by failing to address Defendants' arguments in support of dismissal, *see Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014).

Third, although the FHA is silent on who can be sued, *Fair Hous. Justice Ctr., Inc. v. Broadway Crescent Realty, Inc.*, No. 10-CV-34, 2011 WL 856095, at *4 (S.D.N.Y. Mar. 9, 2011), the AC contains no allegations that describe specific actions taken by the individual Defendants – except Singleton – "that would give rise to an inference of discriminatory intent," *Burrell v. State Farm Fire & Cas. Co.*, No. 00-CV-5733, 2001 WL 797461, at *10 (S.D.N.Y. July 12, 2001). There are no factual allegations in the AC that indicate how those individual Defendants violated the FHA except that they served on governmental entities that have yet to approve Plaintiffs' site plan or sell them 270 Kisco Avenue. Therefore, the FHA claims against the individual Defendants other than Singleton are dismissed as well, essentially for the same reasons as the § 1983 claims.

Accordingly, Defendants J. Michael Cindrich, Anthony Markus, Jean Farber, Peter Grunthal, Karen B. Schleimer, Douglas Hertz, Ralph Vigliotti, Enrico Mareschi, John Bainlardi, Michael Bonforte, William Polese, Frank Viteritti, John Hochstein, and Joseph Cosentino are dismissed from the case.[4]

---

[4] Defendants also argued that the individual Defendants are entitled to qualified immunity. (Ds' Mem. at 27), and that the Planning Board Defendants are entitled to absolute quasi-judicial immunity, (*id.* at 28-29). I need not reach these issues.

### D.    Board of Trustees and Planning Board

The Board of Trustees and Planning Board are also dismissed because they are not suable entities. "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002). Because the Planning Board and Board of Trustees are administrative arms of a municipality – the Village – they may not be sued. *See MetroPCS N.Y., LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419 (S.D.N.Y. 2010) (dismissing town Planning Board as not a suable entity because merely an administrative arm of the municipality); *Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 343-44 (E.D.N.Y. 2010) (dismissing Town Board and Planning Department as merely administrative arms of the municipality); *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) (Town's Buildings Department, Planning Board, and Zoning Board of Appeals not suable entities).

### E.    Federal Claims

#### 1.    FHA and ADA Claims

Plaintiffs assert violations of the FHA and ADA. (AC ¶¶ 318-348.) While the former statute refers to "disability" and the latter to "handicap," they are analyzed the same way. *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 253 (S.D.N.Y. 2014). "To establish discrimination under either the FHA or the ADA, plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Step by Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 123 (N.D.N.Y. 2016) (internal quotation marks and alterations omitted). Plaintiffs' FHA claim in the AC refers

to and describes legal requirements of both "disparate impact," (AC ¶¶ 329-332), and "reasonable accommodations," (*id.* ¶¶ 319-320, 322, 324), but not disparate treatment. Plaintiffs' ADA claim only seems to includes a reasonable accommodation claim. (AC ¶ 342.)

I will not consider a claim of disparate treatment despite Plaintiff having raised a theory of disparate treatment in their opposition memorandum. (Ps' Opp. at 38-41.) It is well established that a complaint may not be amended by the briefs in opposition to a motion to dismiss. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *see Kiryas Joel All. v. Village of Kiryas Joel*, No. 11-CV-3982, 2011 WL 5995075, at *10 n.9 (S.D.N.Y. Nov. 29, 2011) ("[P]laintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments, and thus the Court does not address the new arguments made in the plaintiffs' memorandum."), *aff'd*, 495 F. App'x 183 (2d Cir. 2012) (summary order). There are no references to disparate treatment or even references to the legal terminology that animate a disparate treatment claim in the AC. Accordingly, I will not allow Plaintiffs to amend by alleging in their opposition papers a different theory of liability than is alleged in the AC.[5]

---

[5] Even if I were to find Plaintiffs had raised a disparate treatment claim, it would still be dismissed for failure to state a claim.

> To establish a *prima facie* case of housing discrimination under the FHA or ADA based on a theory of disparate treatment, Plaintiffs must allege (1) that they are members of a protected class; (2) that they sought and were qualified to rent . . . the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters.

*Wilson v. Wilder Balter Partners, Inc.*, No. 13-CV-2595, 2015 WL 685194, at *7 (S.D.N.Y. Feb. 17, 2015) (internal quotation marks omitted) (alterations in original). Under a disparate treatment theory, "a plaintiff can establish a *prima facie* case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg*, 67 F.3d at 425 (internal quotation marks omitted). First, there is no indication from Plaintiffs' AC that the Village has senior housing only for those without disabilities, *i.e.*, that "the housing opportunity remained available to other renters," *Wilson*, 2015 WL 685194, at *7,

a. *Disparate Impact*

Plaintiffs advance FHA claims against the Village and Singleton for disparate treatment on the basis of disability. Plaintiffs' argument is that by refusing to issue a variance to Plaintiffs for the expanded use of 53 Mountain Avenue, issue site plan approval for 270 Kisco Avenue, and sell 270 Kisco Avenue, Defendants' facially neutral practices actions had a disparate impact on Plaintiffs. (AC ¶ 332.)

To state a claim under a disparate impact theory of discrimination, a plaintiff must plausibly allege that an "outwardly neutral practice has a significantly adverse or disproportionate impact" on persons in the protected class. *Rivera v. Inc. Village of Farmingdale*, 571 F. Supp. 2d 359, 368 (E.D.N.Y. 2008). A plaintiff need not show discriminatory intent but must show that the practice "actually or predictably results in discrimination." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) (internal quotation marks and alteration omitted), *superseded on other grounds by regulation as stated in Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 619 (2d Cir. 2016). "The basis for a successful disparate impact claim involves a comparison between two groups – those affected and those unaffected by the facially neutral policy. This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *Wilson v. New York*, No. 15-CV-23, 2017 WL

---

or that other developers were offered the opportunity to construct such housing in circumstances similar to that of Plaintiffs. Second, while Plaintiffs argue that Singleton eventually favored his friend's project over theirs, they have pointed to no disparate treatment case where a public official's preference of that sort amounted to discriminatory animus or shown that Singleton's favoritism was a significant factor in the Board of Trustees and the Planning Board not approving Plaintiffs' site plan application or application for a variance. Indeed, because Singleton's friend's project was similar to Plaintiffs', (AC ¶ 17), it is not plausible that animus toward the prospective tenants animated the decisionmakers.

9674497, at *15 (E.D.N.Y. Jan. 24, 2017) (internal quotation marks omitted), *report and recommendation adopted*, 2018 WL 1466770 (E.D.N.Y. Mar. 26, 2018). "Oftentimes, disproportionate impact is demonstrated through the use of statistics." *Valdez v. Town of Brookhaven*, No. 05-CV-4323, 2005 WL 3454708, at *13 (E.D.N.Y. Dec. 15, 2005).

Plaintiffs have failed on both elements with respect to both the Village and Singleton. First, Plaintiffs have failed to show the occurrence of outwardly neutral practices. Plaintiffs' complaint here is not about a facially neutral policy or practice, but about specific acts that Defendants took that relate only to Plaintiffs. The AC says in conclusory fashion that Defendants' "facially-neutral practices . . . actually caused and resulted in a significantly adverse or disproportionate impact on Plaintiffs (and specifically disabled or handicapped senior citizens"), (AC ¶ 332), and they make a passing reference in their opposition memorandum to "Defendants' facially-neutral site plan review procedures," (Ps' Opp. at 40). But they do not identify any such policy or practice. Instead, they challenge actions taken by Defendants to prevent the enforcement of the Stipulation of Settlement and subsequent contractual agreements. Such pleading is insufficient on a claim of disparate impact. *See, e.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 53 (2d Cir. 2002) ("*RECAP*") (denying disparate impact claim under FHA because plaintiff did "not challenge a facially neutral policy or practice; it challenge[d] one specific act: the denial of a special use permit"), *superseded by statute on other grounds*, ADA Amendments of 2008, Pub. L. No. 110-325, 122 Stat. 3553, *as recognized in Tull v. N.Y.C. Hous. Auth.*, 722 F. App'x 75 (2d Cir. 2018) (summary order); *Abrahams v. MTA Long Island Bus*, No. 10-CV-1535, 2010 WL 2134288, at *5 (E.D.N.Y. May 25, 2010) (dismissing disparate impact claim that challenged budget cuts affecting paratransit service, not a policy or practice).

Second, Plaintiffs have not plausibly alleged a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices. The conduct of which Plaintiffs complain – that Defendants violated the terms of their contractual agreements – is particular only to Plaintiffs. It is therefore impossible to make a comparison of whether Defendants' actions caused a significantly adverse or disproportionate impact on disabled persons. *See RECAP*, 294 F.3d at 53 (where challenge is to particular act rather than policy or practice, "[n]o comparison of the act's disparate impact on different groups of people is possible"). Defendants' memorandum correctly notes: "No analysis of the local housing market is alleged. There are no allegations of a history of discrimination in the Village; an actual impact on a protected class or an actual interference with their ability to obtain housing." (Ds' Mem. at 17.) Because the AC contains no facts rendering plausible Plaintiffs' conclusory claim of a neutral policy that has a disparate impact on a protected group, their disparate impact claims under the FHA and ADA against both remaining Defendants are dismissed.

Plaintiffs' heavy reliance on Judge Laura Taylor Swain's 2003 decision in *Town & Country Adult Living, Inc. v. Village/Town of Mount Kisco*, No. 02-CV-444, 2003 WL 21219794, at *5 (S.D.N.Y. May 21, 2003) ("*Town & Country I*") – in which she declined to dismiss Town and Country's FHA and ADA claims arising out of the Village Planning Board's refusal to grant a variance to expand the capacity of the assisted living residence at 53 Mountain Avenue – is misplaced. Plaintiffs argue that Judge Swain's Decision "anchors" their claims and that the Court here is not facing a "blank canvas for Plaintiffs' FHA and ADA claims because Judge Swain previously sustained the earlier iteration of those claims in her 2003 decision." (Ps' Opp. at 39.) I will take judicial notice of Judge Swain's related decision, *see Anderson v.*

*Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 205 n. 4 (2d Cir. 2003) (taking judicial

notice of related district court decision), but it does nothing to salvage Plaintiffs' claims here.

First, all Judge Swain found was that Plaintiffs' allegations sufficed under the then-applicable

pleading standard, under which "a complaint [c]ould not be dismissed for failure to state a claim

unless it appear[ed] beyond doubt that the plaintiff c[ould] prove no set of facts in support of his

claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 46-47 (1957),

*abrogated by Twombly*, 550 U.S. 544. That standard has been "retire[d]," *Twombly*, 550 U.S. at

563, and replaced with the plausibility standard of *Iqbal* and *Twombly*. Judge Swain did not

purport to assess the plausibility of Plaintiffs' pleading in denying the Village's motion to

dismiss. But she did assess Plaintiffs' likelihood of success on the merits in denying its motion

for a preliminary injunction, and after considering not only the complaint but additional material,

found that Plaintiffs lacked evidence that "Defendants' negative actions on Town & Country's

proposals arose from intentional discrimination on the basis of the disabilities of the current and

proposed senior citizen population rather than the aesthetic and zoning code considerations cited

in the relevant decisions." *Town & Country I*, 2003 WL 21219794, at *4.

So Judge Swain's decision contributes nothing to – and if anything, detracts from –

Plaintiffs' effort to show the plausibility of the instant claims. And even if this Court were to

interpret her decision as endorsing the disparate treatment argument that Plaintiffs then advanced

– that the Village denied a variance to expand Plaintiffs' facility at 53 Mountain Avenue because

it capitulated to their neighbors' hostility toward disabled people – that would not render the

claims here any more plausible, because the instant claims (which in any event seem limited to

disparate impact and failure to accommodate, (*see* AC ¶¶ 331, 342), arise from an alleged

scheme to violate the Stipulation of Settlement that allegedly began a dozen years before any

members of the public expressed any opposition to the development of 270 Kisco Avenue.  In

other words, even if it were true that the Village was against expansion of 53 Mountain Avenue

because it was influenced by discriminatory neighbors – which the *Town and Country I* decision

by no means suggested was plausible – that would not help render it plausible that discrimination

animated the failure to consummate the development of 270 Kisco Avenue.

b.     *Failure to Reasonably Accommodate*

> A plaintiff seeking recovery under the FHAA can [show] discrimination . . . based
> on disability [through a] failure to make a reasonable accommodation.  A failure to
> make a reasonable accommodation means a refusal to make reasonable
> accommodations in rules, policies, practices, or services, when such
> accommodations may be necessary to afford [a disabled] person equal opportunity
> to use and enjoy a dwelling.  Yet, in any case, claims supported only by conclusory
> statements that defendants discriminated against the plaintiff on account of a
> protected status do not state a plausible cause of action under the FHA.

*Harris v. Dep't of Hous. Pres. & Dev.*, No. 08-CV-1886, 2011 WL 13299800, at *3 (E.D.N.Y.

Apr. 5, 2011) (internal quotation marks and citations omitted) (alteration in original).

> To state a *prima facie* case for discrimination based on a failure to reasonably
> accommodate, a plaintiff must demonstrate that:  (1) he suffers from a [disability
> or] handicap as defined by the [statutes]; (2) the defendant knew or reasonably
> should have known of the plaintiff's [disability or] handicap; (3) accommodation
> of the [disability or] handicap may be necessary to afford plaintiff an equal
> opportunity to use and enjoy the dwelling; and (4) defendants refused to make such
> accommodation.

*Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 336 (E.D.N.Y. 2012) (internal

quotation marks omitted).  "A defendant must incur reasonable costs and take modest,

affirmative steps to accommodate the handicapped as long as the accommodations sought do not

pose an undue hardship or substantial burden." *Taylor v. Harbour Pointe Homeowners Ass'n*,

690 F.3d 44, 49 (2d Cir. 2012) (internal quotation marks omitted).

Defendants argue that Plaintiffs' reasonable accommodation claims fail because Plaintiffs

did not plausibly allege (1) the existence of any comparable accommodation for those senior

36

citizens without handicaps, (Ds' Mem. at 19); and (2) that the claimed accommodation was necessary to afford equal opportunity, (*id.* at 19-20).

In response to Defendants' arguments, Plaintiffs all but ignored their own reasonable accommodation claims. The only explicit reference to the term "reasonable accommodation" in Plaintiffs' opposition memorandum is in a list of available theories under the FHA or ADA. (Ps' Opp. at 38.) Besides that, Plaintiffs only make passing references to the absence of available housing in the Village for seniors with disabilities. (*Id.* at 39-41.) There is no discussion of the elements of a reasonable accommodation claim or any indication from Plaintiffs as to how they plausibly alleged such claims in their AC. Therefore, Plaintiffs have abandoned their reasonable accommodation claims. *See Romeo & Juliette Laser Hair Removal, Inc.*, 2014 WL 4723299, at *7.[6]

2.     Section 1983 Claims

Plaintiff brings two claims under 42 U.S.C. § 1983, for violations of their Fourteenth Amendment due process rights, (AC ¶¶ 372-382), and equal protection rights, (*id.* ¶¶ 383-393).

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

---

[6] In any event, Plaintiffs have not plausibly alleged their reasonable accommodation claims. They are conclusory and rely almost entirely on Judge Swain's 2003 decision, which, as discussed above, does not suffice. They do not specify what accommodation they requested and were refused, or why it was reasonable. There is no indication that the Village has senior housing only for those without disabilities. Nor is there an indication that the process would have gone more smoothly for Plaintiffs if their proposed facility was for non-disabled seniors. *See Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 152 (2d Cir. 1999). Without those facts, the AC does not plausibly allege that "accommodation of the [disability or] handicap may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling." *Sinisgallo*, 865 F. Supp. 2d at 336 (internal quotation marks omitted).

the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Thus, to successfully assert a § 1983 claim, a plaintiff must demonstrate: "(1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under color of state law, or a state actor." *Walker v. Clemson*, No. 11-CV-9623, 2012 WL 2335865, at *3 (S.D.N.Y. June 20, 2012) (internal quotation marks omitted), *report and recommendation adopted*, 2012 WL 3714449 (S.D.N.Y. Aug. 28, 2012).

Plaintiffs' AC alleges that the Village violated Plaintiffs' due process rights by delaying the site plan approval for 270 Kisco Avenue for over twelve years, (AC ¶¶ 377-378), and that Singleton violated Plaintiffs' due process rights by, among other things, providing legal advice to the Village and the other individual Defendants designed to frustrate Plaintiffs' rights and providing legal advice to the Village based on personal relationships and conflicts of interest, (*id.* ¶¶ 379-380).

a.    *Substantive Due Process*

"To state a substantive due process claim, a plaintiff must allege that (1) the complained-of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary." *JG & PG ex rel. JGIII v. Card*, No. 08-CV-5668, 2009 WL 2986640, at *5 (S.D.N.Y. Sept. 17, 2009). In analyzing a plaintiff's substantive due process claim, a court must "first inquire whether a constitutionally cognizable . . . interest is at stake," *Ferran v. Town of Nassau*, 471 F.3d 363, 369 (2d Cir. 2006) (*per curiam*) (internal quotation marks omitted); *see Walker v. City of Waterbury*, 361 F. App'x 163, 165 (2d Cir. 2010) (summary order) ("It is well-established that substantive

38

due process protections extend only to those interests that are implicit in the concept of ordered liberty, rights so rooted in the traditions and conscience of our people as to be ranked as fundamental.") (internal quotation marks and citation omitted), and then determine whether the plaintiff has alleged "governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,'" *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)); *see SeaAir NY, Inc. v. City of N.Y.*, 250 F.3d 183, 187 (2d Cir. 2001) (plaintiff must show that defendant's actions were "an 'exercise of power without any reasonable justification in the service of a legitimate governmental objective'") (quoting *Lewis*, 523 U.S. at 846).

"In assessing a substantive due process claim in the context of land use regulation, [the] Court is always 'mindful of the general proscription that federal courts should not become zoning boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many local legislative and administrative agencies.'" *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) (second and third alterations in original) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 679-80 (2d Cir. 1995)). Indeed, "the Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions; in our federal system, that is the province of the state courts." *Zahra*, 48 F.3d at 680.

To the extent Plaintiffs allege that their property interest is in the Defendants approving Plaintiffs' site plan application, granting a variance to 270 Kisco Avenue, or selling 270 Kisco Avenue, (AC ¶¶ 376, 387-388), Plaintiffs have failed to state a substantive due process claim. "In order for an interest in a particular land-use benefit to qualify as a property interest for the purposes of the . . . due process clause[,] a landowner must show a 'clear entitlement' to that benefit." *O'Mara v. Town of Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007) (quoting *Clubside,*

*Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006)).  A mere "'abstract need or desire'" for the

benefit is insufficient.  *RRI Realty Corp. v. Inc. Village of Southampton*, 870 F.2d 911, 915 (2d

Cir. 1989) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  This "clear entitlement"

test must be applied with "considerable rigor."  *Id.* at 918.

> In applying the entitlement test, [the Court] look[s] to existing rules or
> understandings that stem from an independent source such as state law . . . .
> Accordingly, [the Court] must look in the instant case to New York zoning law to
> ascertain whether plaintiffs had a legitimate claim of entitlement to the . . . zoning
> classification of their land.

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 130 (2d Cir. 1998) (internal quotation

marks and citations omitted).

Plaintiffs here do not have a cognizable property interest in acquiring a site plan

application approval or in obtaining a variance because both require discretion in arriving at a

decision.  The analysis under the "clear entitlement" test "focuses on the extent to which the

deciding authority may exercise *discretion* in arriving at a decision, rather than on an estimate of

the probability that the authority will make a specific decision."  *Zahra*, 48 F.3d at 680

(emphasis in original) (collecting cases).  "Where a local regulator has discretion with regard to

the benefit at issue, there normally is no entitlement to that benefit."  *Gagliardi v. Village of

Pawling*, 18 F.3d 188, 192 (2d Cir. 1994).  "Even if in a particular case, objective observers

would estimate that the probability of issuance was extremely high, the opportunity of the local

agency to deny issuance suffices to defeat the existence of a federally protected property

interest."  *RRI Realty*, 870 F.2d at 918.  The Stipulation of Settlement states:  "[T]he parties do

hereby understand and agree that the Board of Trustees and the Planning Board are required to

exercise independent judgment and discretion in reviewing the aforesaid applications."

(Stipulation of Settlement ¶ 4.)  Because Defendants had discretion to deny the site plan application and the variance, Plaintiffs had no clear entitlement to either.[7]

To the extent Plaintiffs allege a due process denial based on Defendants' "refusing to sell 270 Kisco Avenue to Plaintiffs," (AC ¶ 376), or Defendants' refusal to comply with any other term of the Stipulation of Settlement or subsequent contractual agreements including the HFZ option agreement from February 2017, (*id.* ¶¶ 195, 199-200), Plaintiffs have also failed to state a claim.  Plaintiffs have cited no cases finding a property interest in a settlement agreement.  The Ninth Circuit has explained that

> the use of substantive due process to extend constitutional protection to economic and property rights has been largely discredited. Rather, recent jurisprudence restricts the reach of the protections of substantive due process primarily to liberties deeply rooted in this Nation's history and tradition . . . [such as] personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education, as well as with an individual's bodily integrity.

*Armendariz v. Penman*, 75 F.3d 1311, 1319 (9th Cir. 1996) (*en banc*) (internal citations and quotation marks omitted), *limitation of holding recognized by Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 852-53 (9th Cir. 2007).  While "contract rights can give rise to

---

[7] The Tenth Amendment provides

> Landlord acknowledges and agrees that is has not objected to and will raise no objections to the development, construction, ownership and operation of a senior enriched/independent living housing facility at the Property, so long as it remains substantially in the same form that is proposed before the Planning Board at the time of the execution of this Tenth Amendment.

(Rice Decl. Ex. O ¶ 8; *see* AC ¶ 158.)  This provision did not strip the Village of its discretion to determine whether the project in fact remained in substantially the same form.  Plaintiffs do not allege that they made an application in substantially the same form while the Tenth Amendment was in effect.  Nor – despite their allegation that the Planning Board liked their 2013 application, (AC ¶ 167), but withheld approval pending NYSDEP's decision, (*id.* ¶¶ 168-69) – do they allege plausibly allege that the Village was obligated to issue site plan approval before NYSDEP had signed off, (*see* page 8 above).

constitutional entitlements . . . not *all* contracts between the government and a private party create property interests that warrant constitutional protection, at least not in the context of the Due Process Clause." *Ganci v. N.Y.C. Transit Auth.*, 420 F. Supp. 2d 190, 200 (S.D.N.Y.) (emphasis in original), *aff'd*, 163 F. App'x 7 (2d Cir. 2005) (summary order). Because Plaintiffs' alleged deprivation – enforcement of a settlement agreement – does not stem from a cognizable property interest, Plaintiffs' substantive due process claims are dismissed against both Defendants. *See Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085-86 (10th Cir. 2006) (declining to find a settlement agreement a cognizable property interest under Due Process Clause); *Kumagai v. Brown*, No. 05-CV-37, 2006 WL 8433053, at *5 (D. N. Mar. I. May 18, 2006) (same). *But see Douglas v. N.Y. State Adirondack Park Agency*, 895 F. Supp. 2d 321, 344-45 (N.D.N.Y. 2012) (plaintiff's right to have government entity comply with its prior settlement agreement was property right protected by Due Process Clause).

Second, Plaintiffs have failed to plausibly allege that the state action that deprived them of a property interest was arbitrary. *See Southview Assocs.*, 980 F.2d at 102. Conduct that is deemed to be "arbitrary or oppressive" must "shock the conscience." *West v. Whitehead*, No. 04-CV-9283, 2008 WL 4201130, at *13 (S.D.N.Y. Sept. 11, 2008). "While the measure of what is conscience shocking is no calibrated yard stick," *Lewis*, 523 U.S. at 847, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," *id.* at 849. "Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision[s]." *Southview Assocs.*, 980 F.2d at 102 (internal quotation marks omitted).

On the facts alleged, Defendants' conduct cannot be said to have "transgressed the 'outer limit' of legitimate governmental action," *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421, 434 (N.D.N.Y. 2005) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999), *aff'd in part*, 204 F. App'x 56 (2d Cir. 2006) (summary order), such that it can be said to "shock the conscience." The parties have not cited, and the Court has not found, any cases holding that conduct similar to the complained-of action in this case rises to such a level. To the contrary, Plaintiffs struggled to comply with the requirements to obtain approval and apparently lacked sufficient money and expertise, requiring repeated extensions and ultimately giving up their interest to parties with greater wherewithal. By Plaintiffs' own account, there were several years in which they initiated no activity before the Planning Board. While twelve years is an excessive amount of time to process a site plan application, I cannot say Defendants acted with "no legitimate reason for [their] decision," *Southview Assocs.*, 980 F.2d at 102 (internal quotation marks omitted). The absence of any conscience-shocking facts in the AC and the Circuit's directive that federal courts "should not become fora for appellate review of nonconstitutional land use determinations," *id.* at 103 (internal quotation marks omitted), compel the Court to dismiss Plaintiffs' substantive due process claims.

b.     *Procedural Due Process*

To allege a procedural due process claim, a plaintiff "must first identify a property right, second show that the state has deprived [it] of *that* right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Employees v. Town Bd.*, 31 F.3d 1191, 1194 (2d Cir. 1994) (emphasis in original) (internal quotation marks omitted). This means a plaintiff must prove that it was deprived of "an *opportunity* granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case." *Brady v. Town*

*of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988) (emphasis in original) (alterations and internal

quotation marks omitted).

     As previously discussed, Plaintiffs have not identified a property right protected by the

Due Process Clause. But even assuming that Plaintiffs had identified a protectable property

interest, the AC does not describe any Village Board or Planning Board vote that occurred

without Plaintiffs having notice or an opportunity to be heard, as is required for a procedural due

process violation.[8] *See Dean Tarry Corp. v. Friedlander*, 650 F. Supp. 1544, 1551 (S.D.N.Y.

1987). Further, Plaintiffs had adequate post-deprivation remedies including a state law contract

claim, mandamus, or an Article 78 proceeding. *See Attallah v. N.Y. Coll. of Osteopathic Med.*,

643 F. App'x 7, 10 (2d Cir. 2016) (summary order) (citing *Hellenic Am. Neighborhood Action

Comm. v. City of N.Y.*, 101 F.3d 877, 882 (2d Cir. 1996) ("[T]here is no constitutional violation

(and no available § 1983 action) when there is an adequate state postdeprivation procedure to

remedy a random, arbitrary deprivation of property or liberty.")) (internal quotation marks and

emphasis omitted); *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) ("[A]n

---

[8] Plaintiffs' opposition memorandum alleges that at the April 17, 2017 Board of Trustees
meeting, Defendants organized forty or fifty people to attend to voice opposition to Plaintiffs'
project even though there was nothing on the Board's agenda about Plaintiffs' project. (Ps' Opp.
at 31-32.) Plaintiffs argue that because Plaintiffs' project was not on the Board's agenda,
Plaintiffs were not at the April 17 meeting to counter the opposition, and the Board voted to
suspend prior approval of Plaintiffs' project. (*Id.* at 31.) But Plaintiffs failed to allege many of
these facts in the AC. Instead, Plaintiffs only alleged, in conclusory fashion, that Singleton was
behind a public protest of Plaintiffs' project, (AC ¶ 25, 92, 222; *see id.* ¶ 197), and that some
Board members "turned against the project" despite having previously supported it, (*id.* ¶ 209;
*see id.* ¶ 218). These allegations, woefully unsubstantiated by facts, are insufficient to plead a
due process violation. Further, Plaintiffs' argument omits a significant fact. The Board vote to
suspend the project did not occur at the April 17, 2017 meeting where Singleton allegedly
orchestrated opposition. The resolution to defer the sale was properly noticed for a meeting to
occur on May 1, 2017. (AC ¶ 198.) While Plaintiffs do not specifically allege whether that vote
took place or what the outcome was, I will assume that the resolution to defer passed on that
date. Plaintiffs' claim fails because they do not allege that they lacked notice of the May 1, 2017
meeting or its agenda, or that they had no opportunity to be heard before the vote.

Article 78 proceeding is a perfectly adequate postdeprivation remedy.") (internal quotation marks omitted); *Deperno v. Town of Verona*, No. 10-CV-450, 2011 WL 4499293, at *7 (N.D.N.Y. Sept. 27, 2011) (dismissing procedural due process claim where there were available state law procedures to challenge zoning determination); *Licopoli v. Mineola Union Free Sch. Dist.*, No. 09-CV-3974, 2010 WL 4961667, at *12 (E.D.N.Y. Dec. 1, 2010) (same in breach of contract case) (collecting cases).

c.     <em>Equal Protection</em>

Plaintiffs' AC does not specify whether their equal protection claims fall under a selective enforcement or class of one theory, although their opposition memorandum indicates that they allege both types of claims. (Ps' Opp. at 33-35.) Defendants argue that Plaintiffs fail to state an equal protection claim under either theory. (Ds' Mem. at 25-27.)

A plaintiff states a valid "class of one" equal protection claim when "'(1) she has been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiffs must show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Sacher v. Village of Old Brookville*, 967 F. Supp. 2d 663, 670 (E.D.N.Y. 2013) (internal quotation marks omitted). The comparators' circumstances must be "*prima facie* identical." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotation marks omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (*per curiam*).

To make out a claim for selective enforcement, a plaintiff must "show both (1) that [he was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or

punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

*Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (internal quotation marks omitted). The comparators must be similarly situated in all material respects, a "slightly more relaxed standard" than for class of one claims. *Joglo Realties, Inc. v. Seggos*, No. 16-CV-1666, 2016 WL 4491409, at *9 (E.D.N.Y. Aug. 24, 2016). The discrimination must be intentional or purposeful. *LeClair v. Saunders*, 627 F.2d 606, 610 (2d Cir. 1980). Equal protection claims based on ill will are "lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." *Id.* at 608; *see Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005).

> The "similarly situated" requirement must be enforced with particular rigor in the land-use context because zoning decisions "will often, perhaps almost always, treat one landowner differently from another." *Olech*, 528 U.S. at 565, (Breyer, J., concurring). Given this template, virtually every zoning decision – in the absence of a sensible limiting principle – would be a candidate to find its way to federal court in the guise of an equal protection claim.

*Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007).

Plaintiffs make no effort under either theory to identify sufficiently similar comparators who were treated more favorably. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007) (identification of similarly situated individuals treated differently required for selective enforcement theory); *Witt v. Village of Mamaroneck*, 992 F. Supp. 2d 350, 363 (S.D.N.Y. 2014) (similar for class of one theory). Plaintiffs acknowledge that the Fourteenth Amendment requires the government to treat similarly situated persons alike, (Ps' Opp. at 33), but they never explain how their AC adequately alleges how Defendants failed to do so in this case.

Plaintiffs have not only failed to demonstrate differential treatment, but they have also not plausibly alleged that any such treatment was based on malice or bad faith intent to injure.

While they argue that Singleton favored his friend's project over theirs, they have pointed to no

case where a public official's preference of that sort amounted to malice. Even assuming such

circumstances could be deemed malicious, which I doubt, *see Norwood v. Salvatore*, No. 12-CV-

1025, 2014 WL 203306, at *9 (N.D.N.Y. Jan. 17, 2014) (allegation that defendant favored some

property owners over others does not suffice to allege malice or ill will), it is not plausible that

Singleton or the Village failed to sell 270 Kisco Avenue or approve Plaintiffs' proposed project

there because Singleton, at some point in 2017, began pitching his friend's similar project, (*see*

AC ¶ 202). The problems Plaintiffs had with gaining the necessary approvals and buying the

land began, by their account, a decade before, and continued unremittingly thereafter. It is

implausible that a decade of mistreatment was motivated by a circumstance that did not arise

until the end of that decade. Therefore, Plaintiffs' § 1983 claims are dismissed.

F.    <u>State Law Claims</u>

In addition to their federal claims, Plaintiffs further allege fourteen state law claims. (AC

¶¶ 236-317, 349-371, 414-421.)[9] The "traditional 'values of judicial economy, convenience,

fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all

federal law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118,

122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Having determined that all of the claims over which this Court has original jurisdiction should be

dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise

---

[9] Plaintiffs voluntarily withdrew three state-law claims in their opposition memorandum: violation of New York State Constitution Article I, Section 11; negligence; and violation of New York Civil Rights Law §§ 40-c and 40-d. (Ps' Opp. at 50.)

supplemental jurisdiction over Plaintiff's remaining state law causes of action. *See id.* (citing 28 U.S.C. § 1367(c)(3)).[10]

IV.  **LEAVE TO AMEND**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment . . . .'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended once, after having the benefit of a pre-motion letter from Defendants, (Doc. 49), as well as the Court's observations during a pre-motion conference, (Minute Entry dated Feb. 16, 2018). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (alteration, footnotes, and internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d

---

[10] Defendants also levied a series of arguments that Plaintiffs' claims should be dismissed as barred by the terms of the lease and amendments or by release. (Ds' Mem. at 10-13.) Because I am dismissing Plaintiffs' claims, I need not reach these issues.

222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, Plaintiffs have not asked to amend or suggested that they are in possession of facts that would cure the deficiencies identified in this opinion. Accordingly, the Court declines to grant leave to amend *sua sponte. See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted); *TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request that was not made."); *id.* (proper to dismiss with prejudice where no indication plaintiff could or would provide additional allegations leading to different result).

## V.    <u>CONCLUSION</u>

Accordingly, Defendants' motion to dismiss is GRANTED.  The federal claims are dismissed with prejudice; the withdrawn state claims (New York Constitution Article I, negligence, and New York Civil Rights Law) are dismissed with prejudice; and the remaining state claims are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 83), and close the case.

**SO ORDERED.**

Dated:  March 26, 2019
        White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.